**STATE of Iowa, Appellee,**

v.

**Tonya Mae BRIGGS, Appellant.**

No. 01–1914.

Supreme Court of Iowa.

July 16, 2003.

Christopher A. Kragnes and Tiffany Koenig, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor, Assistant Attorney General, John P. Sarcone, County Attorney, and Thomas DeSio, Assistant County Attorney, for appellee.

CADY, Justice.

In this appeal, we consider whether the imposition of cash only bail violates the Iowa Constitution. We conclude that it does not, and affirm the district court.

## I. Background Facts and Proceedings.

On August 10, 2001, Des Moines police arrested Tonya Briggs after she propositioned an undercover police officer. Briggs was later charged with prostitution, marking the fourth time she had been charged with the same offense in less than a year. She made an initial appearance on August 11 and, after her bond was reviewed, was released on $6500 bond "cash/surety" pending her arraignment on September 24. She posted bail on August 19 with the assistance of a local bail bond company.

Briggs did not appear for her arraignment on September 24. This prompted the district court to issue a bench warrant for her arrest. The warrant set bond at $6500 "CASH." Briggs eventually appeared for arraignment and her bond was

continued, "at 6,500—cash only," pending her pretrial conference and trial.

Before the date of her pretrial conference arrived, Briggs filed an application for bond review. She argued she "is guaranteed the right to reasonable bail by the Fourteenth Amendment [of the United States Constitution] and by Article I, Section[s] 12 [and] 17 of the Constitution of the State of Iowa." Following a hearing on her application the district court denied the request. It observed,

> [the] [p]urpose of a bond is to ensure the defendant's presence on court dates and also to ensure protection of the public. Based on the defendant's criminal history and the fact that she did fail to appear for her arraignment in this case, the Court does find that $6,500 cash only is reasonable to ensure her presence and to ensure the protection of the public from further criminal activity.

Immediately after the denial of the application, Briggs signed a waiver of jury trial and stipulation to a trial on the minutes of testimony on the prostitution charge. She was found guilty and agreed to waive her right to file a motion in arrest of judgment, allowing for her immediate sentencing to a period of incarceration not to exceed two years. On November 20, Briggs filed a timely notice of appeal from the judgment and sentence of the district court, alleging the district court's restriction of her bail to "cash only" violated several constitutional provisions.

## II. Standard of Review.

■ Ordinarily, we review a district court's decisions related to bail for an abuse of discretion. *State v. Kellogg,* 534 N.W.2d 431, 433 (Iowa 1995). However, Briggs' arguments implicate a number of constitutional provisions, making our review de novo. *See id.* at 434; *see also Klouda v. Sixth Judicial Dist. Dep't of*

*Corr. Servs.,* 642 N.W.2d 255, 260 (Iowa 2002).

## III. Preservation of Error and Mootness.

■ The State contends that Briggs failed to preserve error on her constitutional claims and that her conviction for prostitution based on the minutes of testimony in her case made her claims moot and no longer justiciable before this court. We agree with the State in part on one of these issues.

In her motion for bond review in the district court, Briggs alleged the imposition of cash only bail impinged on a constitutional right derived from the Fourteenth Amendment to the United States Constitution. On appeal, she alleges a violation arising out of the "excessive bail" clause of the Eighth Amendment. *See* U.S. Const. amend. 8. The State argues Briggs failed to cite the Eighth Amendment in presenting her initial arguments in the district court, and this failure constituted a waiver of any such claim on appeal. We agree.

Several principles can be stated in relation to the Eighth and Fourteenth Amendments. *See Willson v. City of Des Moines,* 386 N.W.2d 76, 80 (Iowa 1986) (quoting *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 677–78, 88 L.Ed.2d 662, 672 (1986) (Stevens, J., concurring)). The Fourteenth Amendment, of course, is the gateway through which the guarantees of most of the provisions of the Bill of Rights are made applicable to the actions of individual states and state actors. *See id.* Thus, the provisions of the Eighth Amendment—as portions of the Bill of Rights—could potentially apply to this controversy via the guarantees of the Fourteenth Amendment. *See id.* Of course, the Fourteenth Amendment has other applications, including the extension of due process rights to all citizens. *See id.* In

some fashion, each of these principles may be applicable to Briggs' constitutional claim, and may have influenced the method by which her claim was put before the district court.

Yet, as a result of the method by which her claim was actually presented, it is impossible to say precisely what federal constitutional claim Briggs presented to the district court and whether that same claim is being reasserted on appeal. The clearest indicator of this confusion is Briggs' failure to mention the Eighth Amendment in the district court (although mentioning the Fourteenth Amendment) while premising her federal constitutional claim on the Eighth Amendment (without discussing the Fourteenth Amendment) on appeal. We could infer that Briggs attempted to argue an "excessive bail" claim arising from the Eighth Amendment as incorporated by the Fourteenth Amendment in the district court, yet this is far from clear given the limited argument on this issue. We could also just as easily conclude that her initial allegation of a violation arising from the Fourteenth Amendment was premised on due process guarantees.[1] Yet, such a claim is far different than arguing—as she does on appeal—a violation of the Eighth Amendment. In short, we believe this confusion is indicative of the failure to properly preserve error on a claimed violation of a federal constitutional right relating to cash only bail. Thus, we agree with the State that Briggs has failed to preserve error on this portion of her claim.

 On the other hand, we do believe she preserved error on her state constitutional claims. A more intriguing question, however, is whether this controversy is moot and no longer justiciable in light of Briggs' waiver and stipulation and the district court's determination of her guilt. As a rule, we do not decide appeals in which "the issue becomes nonexistent or academic and, consequently, no longer involves a justiciable controversy." *State v. Hernandez–Lopez*, 639 N.W.2d 226, 234 (Iowa 2002). However, an exception to this rule exists for those cases presenting "issues of broad public importance likely to recur." *Id.* Briggs' arguments based on the propriety of her bail became moot after she waived her jury trial and was found guilty. Any decision we issue relating to cash only bail will have no further effect on her at this point in time. To determine whether her claim should still be considered, we look to four factors:

> (1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review.

*Id.* After considering these factors, we conclude that we should entertain this controversy despite it being moot.

Questions resting on the nature and propriety of cash only bail are of a pressing public interest. The imposition of cash only bail is a regular occurrence in our district courts. The constitutional implications of this form of bail are of great relevance for members of the public, the bar, and the judiciary. The need to provide guidance on this issue is manifest. Moreover, in the absence of authoritative guidance, it is highly likely this issue will recur, potentially resulting in varied and inconsistent interpretations of important

---

1. Further confusing this issue is the fact that Briggs also alleged initially a violation of the Equal Protection Clause of the Fourteenth Amendment, claiming invidious discrimina-tion in the imposition of cash only bail. *See* U.S. Const. amend. 14, § 1. No mention of equal protection or invidious discrimination is made on appeal.

constitutional provisions. Finally, although it is conceivable that this issue could reach us under circumstances that would not involve a moot controversy, we believe this issue is highly likely to recur yet evade our review. For all of these reasons, we believe this is one of the exceptional circumstances in which our review is proper even in light of the mootness of the underlying controversy. We turn now to our consideration of the core issue presented by this appeal.

## IV. Bailable by Sufficient Sureties.

■ Briggs argues that the intersection of two provisions of the Iowa Constitution prevents the imposition of cash only bail. Primary of these two is article I, section 12, which provides:

> No person shall after acquittal, be tried for the same offence. All persons shall, before conviction, be bailable, *by sufficient sureties*, except for capital offences where the proof is evident, or the presumption great.

Iowa Const. art. I, § 12 (emphasis added). In Briggs' estimation, the "sufficient sureties" clause of section 12 precludes any bail option that prevents unfettered access to a surety. Thus, she argues, the

sufficient sureties clause, combined with the "excessive bail" clause of article I, section 17 of the Iowa Constitution, bars the imposition of cash only bail. Iowa Const. art. I, § 17 (*"Excessive bail shall not be required;* excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." (Emphasis added.)). Briggs asserts that this interpretation is consistent with and commanded by the language of the Iowa Constitution, especially in light of that language's meaning at the time of our constitution's drafting.

It is necessary to note at the outset the full context in which the district court's decisions related to bail were made. Although Briggs correctly cites the two constitutional provisions on bail, she pays little heed to the statutory provisions of the Iowa Code, which also play an important role in any bail analysis. As the State indicates, the district court acted in accordance with the provisions of chapter 811 of the Iowa Code—which describe the operation of the bail process—in setting Briggs' bail. *See* Iowa Code §§ 811.1–.12. Most importantly, Briggs' bail was apparently considered and reconsidered in light of the provisions of Iowa Code section 811.2.[2]

---

2. Iowa Code section 811.2 (2001) provides in part:

 1. *Conditions for release of defendant.* All bailable defendants shall be ordered released from custody pending judgment or entry of deferred judgment on their personal recognizance, or upon the execution of an unsecured appearance bond in an amount specified by the magistrate unless the magistrate determines in the exercise of the magistrate's discretion, that such a release will not reasonably assure the appearance of the defendant as required or that release will jeopardize the personal safety of another person or persons. When such determination is made, the magistrate shall, either in lieu of or in addition to the above methods of release, impose the first of the following conditions of release which will

reasonably assure the appearance of the person for trial or deferral of judgment and the safety of other persons, or, if no single condition gives that assurance, any combination of the following conditions: . . .

 *d.* Require the execution of a bail bond with sufficient surety, or the deposit of cash in lieu of bond. However, except as provided in section 811.1, bail initially given remains valid until final disposition of the offense or entry of an order deferring judgment. If the amount of bail is deemed insufficient by the court before whom the offense is pending, the court may order an increase of bail and the defendant must provide the additional undertaking, written or in cash, to secure release. . . .

 *e.* Impose any other condition deemed reasonably necessary to assure appearance

The presence and operation of these statutory bail provisions forces us to reframe the argument Briggs presents. Although her challenge is focused on the district court's decision denying her application for bond review, the bail questions before the court arose in the context of the Iowa Constitution *and* Iowa Code section 811.2. Because Briggs challenges a bail determination resting on a statutory provision, she carries the heavy burden of rebutting the presumption that the statute is constitutional. *State v. Biddle*, 652 N.W.2d 191, 200 (Iowa 2002). Accordingly, she "must negate every reasonable basis upon which the court could hold the statute constitutional" and "show beyond a reasonable doubt that [the] statute violates the constitution." *Id.*

■ To determine whether Iowa Code section 811.2 and, in turn, the decisions of the district court violate the constitution, we must first determine the actual meaning of the sufficient sureties clause. Our polestar in this analysis is the intent of the framers of our constitution. *Howard v. Schildberg Constr. Co.*, 528 N.W.2d 550, 553 (Iowa 1995); *see also Edge v. Brice*, 253 Iowa 710, 718, 113 N.W.2d 755, 759 (1962) (noting the framers' intent that constitutional provisions "endure for an extended future period"). First and foremost, "[w]e give the words used by the framers their natural and commonly-understood meaning." *Howard*, 528 N.W.2d at 553. However, we may also "examine the constitutional history and consider 'the object to be attained or the evil to be remedied as disclosed by the circumstances at the time of adoption.' " *Id.* (quoting *Redmond v. Ray*, 268 N.W.2d 849, 853 (Iowa 1978)).

As both parties indicate, any attempt to give the words of the sufficient sureties clause "their natural and commonly-understood meaning" is impeded by the changing understanding of this terminology from the time of our constitution's drafting to the present. *Id.* Although an interpretation that incorporates modern understandings of the terms is possible, we believe it is necessary to examine our constitutional history to properly gauge the intent of the framers in including this clause. *See id.* This requires an abbreviated review of the history of bail, the role of sureties in the bail system, and our constitution. At the intersection of these histories, the meaning and purpose of the sufficient sureties clause is revealed.

### 1. "Sufficient Sureties" in Historical Perspective.

It is generally accepted that the concept of bail arose in medieval England as a method by which feudal sheriffs could, at their discretion, release prisoners from squalid local jails while they waited for traveling judges to arrive in the area and conduct any necessary trials. *Bail: An Ancient Practice Reexamined*, 70 Yale

---

as required, or the safety of another person or persons including a condition requiring that the defendant return to custody after specified hours, or a condition that the defendant have no contact with the victim or other persons specified by the court. . . .
 2. *Determination of conditions.* In determining which conditions of release will reasonably assure the defendant's appearance and the safety of another person or persons, the magistrate shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the defendant's family ties, employment, financial resources, character and mental condition, the length of the defendant's residence in the community, the defendant's record of convictions, including the defendant's failure to pay any fine, surcharge, or court costs, and the defendant's record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings.

L.J. 966, 966 (1961) [hereinafter Yale article]; Ronald L. Goldfarb, *Ransom: A Critique of the American Bail System* 23–24 (1965); Daniel J. Freed & Patricia M. Wald, *Bail in the United States* 1 (1964); *see also* June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L.Rev. 517, 519–21 (1983). *But see* Goldfarb at 6, 21–23 (noting other possible origins of bail). A prisoner's release was often conditioned on his or her delivery into the hands of a surety, a responsible third-party known to the sheriff and the prisoner, who guaranteed the presence of the accused for any further court proceedings. Freed & Wald at 1; Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L.Rev. 731, 745 (1996). If the surety failed to deliver the accused at the appropriate time, he became personally responsible for providing some recompense to the state. Freed & Wald at 1; Yale article at 966. In the beginning, the surety was seen as literally standing in the place of the prisoner, thus permitting the state to punish the surety in the same way it would have punished the absent prisoner. Drimmer, 33 Hous. L.Rev. at 744 n. 60; *see also* Carbone, 34 Syracuse L.Rev. at 520. Bail guarantees linked to monetary or property forfeiture were not conceived of initially and only developed over time. *See* Freed & Wald at 1.

The medieval bail system sustained itself by serving the interrelated interests of the state, the prisoner, and the surety. The state avoided the costs of jailing a prisoner, forfeiting direct supervision for a guarantee that the prisoner would be returned at the appropriate time. The prisoner gained temporary freedom, supervision by an individual often of their own choosing, and the tantalizing opportunity to "skip" bail and avoid punishment. As a counterbalance to the threat of physical or monetary forfeiture, sureties were granted wide-ranging powers to ensure the accused remained under their control. Unfortunately, the system was rife with corruption, characterized by inconsistent application, and often harsh in its outcomes. *See* Carbone, 34 Syracuse L.Rev. at 323–24; Goldfarb at 26.

In an attempt to alleviate these problems, the bail system's precepts were codified and regulated by the Statute of Westminster in 1275. Carbone, 34 Syracuse L.Rev. at 523–24. While the Statute codified problematic contemporary bail practices, it also provided the first standardization of those practices and allowed for the bail system to be uniformly administered for the first time. *Id.;* Yale article at 966. It accomplished this in part by specifying "the conditions under which pretrial release was permissible" and "limit[ing] the power of the sheriff to determining sufficient security in each case, a power subsequently transferred to justices of the peace." Yale article at 966. It also provided "a rudimentary recognition of a right to bail for at least that small class of prisoners whom the local sheriff" was now required to allow to be bailed. Carbone, 34 Syracuse L.Rev. at 523. Each of these concepts would be restated and reapplied over ensuing centuries; but remained at the core of nearly all bail systems.[3] *See id.* at 527–33.

**3.** The initial recognition of a right to bail of the Statute of Westminster underlies the language of a majority of state constitutions and successive forms of federal legislation guaranteeing bail in certain cases. *See Bail: An Ancient Practice Reexamined,* 70 Yale L.J. 966, 977 app. (1961). Indeed, the first portion of article I, section 12 of the Iowa Constitution contemplates that, "[a]ll persons *shall,* before conviction, *be bailable.*" (Emphasis added).

When the first English colonists arrived in America in the seventeenth century, they brought the bail system with them. *Id.* at 529. However, they were largely disenchanted "with the confusing and conflicting categories of the [Statute of Westminster]· and colonial constitutions forged a new definition of the right to bail." *Id.; see· also* Goldfarb at 26–27 (describing the subsequent evolution of some of the reforms generated by the Statute of Westminster). .Importantly, the first constitutive documents of the colonies, the Massachusetts Body of Liberties (1641) and the Pennsylvania Constitution (1682), each included mandatory bail provisions with a "sufficient sureties" clause. Carbone, 34 Syracuse L.Rev. at 530–32. The Pennsylvania provision was later incorporated into the state's first post-independence constitution, providing a model for other state constitution drafters to follow. *See id.* at 532; *see also* Yale article at 977 app. (listing state constitutions containing a sufficient sureties clause).

At the same time, the dramatic expansion of the colonial population and the seemingly limitless frontier beyond the colonies' borders provoked some necessary alterations to the way the system had traditionally functioned. Individuals' ties to their local community became increasingly attenuated; most colonists were, by nature, new to their communities and arrived with limited or non-existent connections to their fellow citizens. Drimmer, 33 Hous. L.Rev. at 748–49. These factors made it difficult for a sheriff to "judge the trustworthiness of sureties and defendants based on personal knowledge." *Id.* at 748. Although sureties in England had utilized monetary and property based guarantees, the colonial bail system soon became dependent on them as a substitute for personal surety. Moreover, this dependence created a business opportunity, and "by the mid-nineteenth century, the personal surety system had evolved into a commercial bond system, with bondsmen charging fees to serve as sureties." *Id.* at 749; *see also* Peggy M. Tobolowsky & James F. Quinn, *Drug–Related Behavior as a Predictor of Defendant Pretrial Misconduct,* 25 Tex. Tech L.Rev. 1019, 1019 n. 2 (1994) ("During the nineteenth century, a commercial or professional bondsman system gradually replaced the personal surety system."); Freed & Wald at 3. Coincidentally, it was during this same era that the citizens of the territory of Iowa approved our first constitution and Iowa was admitted as a state.

### 2. "Sufficient Sureties" in the Iowa Constitution(s).

The bail system had been in operation for centuries before the first settlers of the Iowa territory arrived from Illinois in the early 1830s.[4] *See* James Alton James,

---

Although many state constitutions and federal *legislation* guarantee bail in many cases, it is generally accepted that the United States Constitution includes no such guarantee. *See* 8A Am.Jur.2d *Bail & Recognizance* § 11, at 276 (1997); *see also United States v. Salerno,* 481 U.S. 739, 752–54, 107 S.Ct. 2095, 2104–05, 95 L.Ed.2d 697, 712–14 (1987).

**4.** Civil government in the Iowa territory was borne of the necessity of making and maintaining land claims. James Alton James, *Constitution and Admission of Iowa Into the Un-* *ion,* Stud. in Hist. & Pol. Sci., July 1900, at 9–11; *see also* Benjamin F. Shambaugh, *The Constitutions of Iowa* 27–33 (1934). To that end, the settlers created claim associations invested with powers to grant and enforce such claims. Shambaugh, at 32–33. These associations had constitutive documents, but surviving examples include no mention of bail or any associated concept. *See* Shambaugh, at 33–49· (discussing the content of "squatter constitutions"); Jesse Macy, *Institutional Beginnings in a Western State,* Stud. in Hist. & Pol. Sci., July 1884, at 33–38. In addition, a

*Constitution and Admission of Iowa Into the Union,* Stud. in Hist. & Pol. Sci., July 1900, at 9. In the interim between settlement and admission as a state, the territory operated under four constitutive documents: the Northwest Ordinance of 1787, the Organic Law of Michigan, the Organic Law of Wisconsin, and, finally, the Organic Law of Iowa. Each of these documents applied to the settler population of Iowa, although the Northwest Ordinance provided the baseline statement of law from which each organic law made territory-specific deviations. None of these documents included a sufficient sureties clause, although article 2 of the Northwest Ordinance contemplated a right to bail, providing, in part: "All persons shall be bailable, unless for capital offenses, where the proof shall be evident or the presumption great." Northwest Ordinance, ch. 8, 1 Stat. 50 (1789).

The sufficient sureties clause eventually entered our constitutional lexicon when the delegates to our state's first constitutional convention met to draft our first constitution in October 1844. Unfortunately, no comment is recorded in relation to the clause in the scant records remaining from the convention. *See Fragments of the Debates of the Iowa Constitutional Conventions of 1844 and 1846* (Benjamin F.

Shambaugh ed., 1900) [hereinafter 1844/46 Debates]. The committee charged with drafting a bill of rights delivered a draft in which the clause was present, and the clause remained in the constitution eventually presented to the people for ratification. *See id.* at 24–25, 34–43, 162. Moreover, through thirteen years of turmoil over ratification and two subsequent revisions of our constitution, the clause remained unchanged and, from all indications, uncommented upon.[5] *See id.; The Debates of the Constitutional Convention* 97–226 (1857) [hereinafter 1857 Debates] (providing a transcript of the debate over revisions to the Bill of Rights of the 1844/46 constitution).

### 3. The Meaning of the Sufficient Sureties Clause.

■ The gradual emergence of the sufficient sureties clause and the very limited record of its eventual inclusion in our constitution requires us to draw our conclusions on its meaning and application from the historical development of the bail system and other contextual indicators of its meaning. Ultimately, we believe the core purpose of the clause was to guarantee a bailable individual access to a surety of some form. However, a number of factors

recounting of the first murder trial within the Iowa territory makes no mention of bail or a bailing process. *See* Macy, Stud. in Hist. & Pol. Sci., July 1884, at 7–8.

5. Iowa's constitution "belongs to a group of Constitutions adopted from 1845 to 1857" which, in the opinion of one commentator, represent "the fully matured constitutional system." Emlin McClain, *The Constitutional Convention and the Issues Before It, in Proceedings of the Fiftieth Anniversary of the Constitution of Iowa* 155, 164 (1907). All but four of the constitutions adopted in original or revised form during this period included a sufficient sureties clause. *See* Cal. Const. art. I, § 7 (1849); Ill. Const. art. XIII, § 13 (1848); Ind. Const. art. I, § 17 (1851); Iowa

Const. art. I, § 12 (1846); Kan. Const. Bill of Rights no. 14 (1857); Kan. Const. art. I, § 9 (1855); Ky. Const. art. XIII, § 18 (1850); La. Const. tit. VI, art. 104 (1852); La. Const. tit. VI, art. 108 (1845); Minn. Const. art. I, § 7 (1857); N.J. Const. art. I, § 10 (1844); Ohio Const. art. I, § 9 (1851); Or. Const. art. I, § 14 (1857); Tex. Const. art. I, § 9 (1845); Wis. Const. art. I, § 8 (1848); *see generally* Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* (1909) (providing the four state constitutions adopted during this period that did not include "sufficient sureties" clauses (Maryland (1851), Michigan (1850), New York (1846), and Virginia (1850))).

leads us to conclude that the framers did not intend that such access be unfettered or tied specifically to a commercial bonding process.

The strongest support for our conclusions rests on the language of the clause itself in historical perspective. We believe the framers were at least familiar with the history of the bailing process and the role of surety in that process. Moreover, we know that the framers were familiar with the provisions of other constitutive documents and regularly referenced them in the course of debating drafts of our constitution. *See, e.g.,* 1844/46 Debates at 35, 40, 45; 1857 Debates at 98 (realizing the convention was to debate the report on the Bill of Rights, one delegate "began to compare our Bill of Rights with the Bill of Rights in the constitutions of other States," noting, "I suppose that was the reason why these constitutions were given to us, that we might have the opportunity of making these comparisons."). These factors indicate that the framers were conscious of the historical lineage of the words they chose and meant what they said: "[a]ll persons *shall* ... be bailable, *by sufficient sureties,*" subject to some exceptions. Iowa Const. art. I, § 12 (emphasis added). We believe this was a clear creation of a right to access a surety of some form. However, this language does not indicate that the framers intended that a person should be bailable by *any* surety without limit.

To the contrary, the framers chose an explicit limitation on access to a surety by using the word *sufficient* in the sufficient sureties clause. By including this qualification for a surety, the framers carved out a measure of discretion for the person overseeing the bailing process. This was consistent with the historical approach to sureties. *See* Yale article at 966 (noting that one of the innovations of the Statute of Westminster was its limitation on "the power of the sheriff to determining sufficient security in each case, a power subsequently transferred to justices of the peace"). Moreover, we believe this investment of discretion with the judicial officer was part of a quid pro quo for a bailable individual that reflected the historical relationship between the state, the prisoner, and the surety.

Our framers chose to provide a limited right to bail in the Iowa Constitution, and provided some protection for this right in that a sufficient surety could bail an accused individual. In exchange, the framers created a potential exception by which the state could retain oversight over this process. Ultimately, this trade off served what has long been acknowledged to be the primary purpose of bail: assuring a defendant's appearance in court. *See Ex Parte Milburn,* 34 U.S. (9 Pet.) 704, 709, 9 L.Ed. 280, 282 (1835); *State v. Cain,* 608 N.W.2d 793, 796 (Iowa 2000); *State v. Costello,* 489 N.W.2d 735, 737 (Iowa 1992); *State v. Zylstra,* 263 N.W.2d 529, 531 (Iowa 1978); *see also Rendel v. Mummert,* 106 Ariz. 233, 474 P.2d 824, 828 (1970); *People ex rel. Gendron v. Ingram,* 34 Ill.2d 623, 217 N.E.2d 803, 806 (1966) ("Sufficient, as used in the [Illinois] constitution, means sufficient to accomplish the purpose of bail, not just the ability to pay in the event of a 'skip.' "). The defendant was given a right to be bailed, subject to the state's analysis of a surety's sufficiency to provide adequate recompense if the prisoner did not show for his judicial proceedings. By allowing a court to judge the sufficiency of the surety, the court was also permitted to judge—implicitly—the sufficiency of the surety's interest in making sure the prisoner was present for further court proceedings. Yet, no part of this process dictates unfettered access to a surety for a prisoner. In fact, unfettered access would be contrary to the language

of our constitution and, indeed, the long history of the bail system's development and operation.

We are also confident that the framers did not intend to favor one particular method of surety—commercial bonding—by inclusion of the sufficient sureties clause. The historical record bears out that the concept of commercial bonding was emerging around the time of our constitution's framing. This emergence brought to light a new concept that deviated from the traditional methods of personal, monetary, or property surety that featured highly personalized contact between the state, the prisoner, and the surety. While it is possible that our framers had both traditional and commercialized surety in mind when drafting the sufficient sureties clause, we do not believe the traditional form of surety had been fully eclipsed nor was the commercial form truly ascendant. At most, our framers had both forms in mind.[6] To conclude the sufficient

sureties clause extends an unfettered right to a commercial bail bondsmen contradicts the language of our constitution as well as historical reality.

Iowa Code section 811.2 permits a district court judge to set cash only bail if such bail will best guarantee the accused's further presence for necessary judicial proceedings. *See* Iowa Code § 811.2(1)(d), (e). In light of the foregoing discussion, we conclude that this is permissible under the sufficient sureties clause of the Iowa Constitution so long as the accused is permitted access to a surety in some form.[7] However, if the accused shows that the bail determination absolutely bars his or her utilization of a surety of some form, a court is constitutionally bound to accommodate the accused's predicament.

■ Finally, we believe it is possible that a cash only bond could be found unconstitutional under the excessive bail clause of article I, section 17 of the Iowa

6. It is not insignificant that the Iowa Constitution was likely patterned on several state constitutions that included sufficient sureties clauses drafted *before* commercial bonding emerged. *See* Ala. Const. art. I, § 17 (1819); Ark. Const. art. II, § 16 (1836); Conn. Const. art. I, § 14 (1818); Del. Const. art. I, § 12 (1831); Del. Const. art. I, § 12 (1792); Fla. Const. art. I, § 11 (1838); Ill. Const. art. VIII, § 13 (1818); Ind. Const. art. I, § 14 (1816); Ky. Const. art. X, § 16 (1799); Ky. Const. art. XII, no. 16 (1792); Mich. Const. art. I, § 12 (1835); Miss. Const. art. I, § 17 (1832); Miss. Const. art. I, § 17 (1817); Mo. Const. art. XIII, § 11 (1820); Ohio Const. art. VIII, § 12 (1802); Pa. Const. art. IX, § 14 (1838); Pa. Const. art. IX, § 14 (1790); Tenn. Const. art. I, § 15 (1834); Tenn. Const. art. XI, § 15 (1796). Although the historical exigencies of the day clearly influenced our framers in other regards, the emergence of commercial bail bonding—which easily could have engendered significant debate and alteration of the traditional sufficient sureties clause—apparently did not. *See* Shambaugh at 145 (discussing the delegates' preoccupation with drafting language pertain-

ing to banking corporations in light of "the sting of recent bank failures and the evils of a depreciated currency"). Instead, the sufficient sureties clause appeared in our constitution seemingly by rote. *See Fragments of the Debates of the Iowa Constitutional Conventions of 1844 and 1846* 24–25, 34–43, 162 (Benjamin F. Shambaugh ed., 1900).

7. We are aware that other jurisdictions have come to opposite conclusions on cash only bail in light of the provisions of their state constitutions or other state law. *State v. Parker*, 546 So.2d 186, 186 (La.1989); *State v. Golden*, 546 So.2d 501, 503 (La.Ct.App.1989); *State v. Brooks*, 604 N.W.2d 345, 352 (Minn. 2000); *State ex rel. Jones v. Hendon*, 66 Ohio St.3d 115, 609 N.E.2d 541, 544 (1993); *Lewis Bail Bond Co. v. General Sessions Ct. of Madison County*, No. C–97–62, 1997 WL 711137, at *5 (Tenn.Ct.App. Nov.12, 1997). However, the historical emergence of the sufficient sureties clause in light of our constitutional history leads us to conclude the Iowa Constitution includes a right of access to a surety, but does not guarantee unfettered access.

Constitution. However, we do not believe the excessive bail clause combines with the sufficient sureties clause so as to automatically prevent cash only bail. Instead, we believe the excessive bail clause works with the sufficient sureties clause to protect the interests of the prisoner in the interrelationship between the state, the prisoner, and the surety. Thus, it is conceivable that the use of cash only bail could violate the excessive bail clause even though its use does not automatically violate the sufficient sureties clause.

## V. Application to Briggs' Appeal.

■ Briggs claims the imposition of cash only bail in her case has violated both the sufficient sureties and excessive bail clauses. However, she presented no evidence to show that she was absolutely precluded from accessing a surety of some form. Instead, her allegations appear to center on the denial of access to a commercial bail bond. As we concluded above, there is no absolute right ·to such access. Briggs has made no claim that she could not otherwise find a sufficient surety. Under other circumstances, we would, perhaps, remand this issue to the district court to determine whether Briggs' access to a surety was completely precluded. However, Briggs' claim is moot, and any further remand on this issue would be an unwarranted and unnecessary waste of judicial resources.

We also conclude that Briggs' allegation that her cash only bail was excessive is unavailing. We do not often have the opportunity to consider our excessive bail clause. However, when we do have such an opportunity, the similarity between our clause and the Eighth Amendment's prohibition on excessive bail "permits us to look to the interpretations by the United States Supreme Court for guidance in interpreting our own clause." *State v. Izzolena,* 609 N.W.2d 541, 547 (Iowa 2000). The Court's clearest statement on the federal excessive bail clause came in its observation that "[t]he only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil." *United States v. Salerno,* 481 U.S. 739, 754, 107 S.Ct. 2095, 2105, 95 L.Ed.2d 697, 713 (1987). A consideration of this limitation requires a comparison between "the interest the Government seeks to protect" and the method by which it is being protected. *Id.*

Iowa Code section 811.2 vests the determination of the appropriate form of bail in the discretion of the district court. Iowa Code § 811.2. The court's determination is guided by the necessity of "reasonably assur[ing] the appearance of the person for trial or deferral of judgment and [guaranteeing] the safety of other persons." *Id.* § 811.2(1). These purposes are accomplished by considering a number of factors in setting bail, including the nature of the defendant's offense, prior record of criminal activity, and adherence to any other bail requirements imposed by the district court in the past or present. *See id.* § 811.2(2).

Briggs stood accused of prostitution for the fourth time within a single year. The district court at first permitted her to be bailed by commercial bond, but Briggs abused that opportunity by "skipping" bail and failing to appear for her arraignment. After Briggs appeared for arraignment and the district court set her bail at cash alone Briggs challenged the court's decision by an application for bond review. In reviewing that application and refusing to alter the bail amount and method of satisfaction, it is clear that the district court considered the purpose of bail and the interests the government sought to protect. Moreover, the method by which the

state protected that interest—bail set at $6500 cash—was reasonably related to those interests. We conclude that Briggs' bail was not excessive.

## VI. Conclusion.

For all of the foregoing reasons, we affirm the district court's decisions related to bail as well as its judgment and sentence.

**AFFIRMED.**

All justices concur except CARTER, J., LAVORATO, C.J., and TERNUS, J., who dissent.

CARTER, Justice (dissenting).

I dissent.

Under the bill of rights to our constitution, "[a]ll persons shall, before conviction, be bailable, *by sufficient sureties,* except for capital offences where the proof is evident, or the presumption great." Iowa Const. art. I, § 12. This language clearly mandates that those accused of noncapital offenses are bailable. In describing how the accused is bailable, the constitution expressly provides that this shall be "by sufficient sureties." A requirement of cash bail is not a surety transaction. Our bill of rights was adopted in 1857. Three years prior thereto this court, relying on the current edition of "Webster's Dictionary," defined surety as

> one who enters into a bond, or recognizance to answer for another's appearance in court, or for his payment of a debt or for the performance of some act.

*Pitkins v. Boyd,* 4 Greene 255, 259 (Iowa 1854). A surety transaction is a tripartite arrangement between an obligee, a principal obligor, and a secondary obligor who vouches for the performance of the primary obligor.[8]

The majority states that, "if the accused shows that a bail determination absolutely bars their utilization of a surety of some form, a court is constitutionally bound to accommodate the accused's predicament." A cash-only bond is a per se denial of the constitutional guarantee to bail "by sufficient sureties." The majority mistakenly assumes that a surety arrangement may exist by having a third party post the bail. That would not involve a surety relationship and, indeed, is not possible under Iowa law. We have recognized that

> there are no provisions for the deposit of money by any person other than the defendant himself—no right of surrender except by the bail or the defendant himself, and when a deposit of money is made, no right of return, except to the defendant. The thought that a third person may furnish the money that defendant is authorized to deposit and afterwards surrender the defendant and secure a return of the deposit is distinctly negatived.

*State v. Owens,* 112 Iowa 403, 407, 84 N.W. 529, 530 (Iowa 1900). Although this case was decided under the bail statutes in effect at the time, I submit it is fairly reflective of the understanding of cash bail prevailing at the time the bill of rights was adopted.

The fact that there is a statutory provision for posting cash bond cannot overturn a constitutional provision guaranteeing the right to be bailable by sufficient sureties. Nor does the statute in fact attempt to do that. It provides:

---

**8.** Every "suretyship" involves three parties: "principal" whose debt or default is subject to the transaction; "obligee," one to whom debt or obligation runs; and "surety," one that undertakes to perform debt or obligation if principal does not.

72 C.J.S. *Principal & Surety* § 2, at 175 (1987).

[T]he magistrate shall, either in lieu of or in addition to the above methods of release [release on recognizance] impose the first of the following conditions of release which will reasonably assure the appearance of the person for trial . . .:

. . . .

d. Require the execution of a bail bond with sufficient surety, or the deposit of cash in lieu of bond.

Iowa Code § 811.2 (2001). I submit that the language "in lieu of bond" in this statute is fairly read to mean that cash may be posted in lieu of a surety bond at the election of the person required to post bond. That type of interpretation would be consistent with the constitutional guarantee. The majority's contribution is inconsistent with the constitutional guarantee.

The majority argues that, because the framers limited bail to the providing of "sufficient sureties," they carved out a measure of discretion for the person overseeing the bail process. Of course, the person overseeing the bail process must be satisfied with the sufficiency of the surety arrangement. That does not mean, however, that the persons overseeing the bail process may deny the constitutional right to bail by surety by requiring that bail involve the posting of cash.

The Supreme Court of Ohio, in interpreting a similar constitutional provision guaranteeing bail by surety, held that

the judge's discretion is limited to setting the amount of the bond. Once that amount is set, and the accused exercises his constitutional right to list a surety to post bail on his behalf, that being one of the options set forth in [the statute], the clerk of courts must accept a surety bond to secure the defendant's release, provided the sureties thereon are otherwise sufficient and solvent.

*State v. Hendon*, 66 Ohio St.3d 115, 609 N.E.2d 541, 543–44 (1993).[9] Similarly, the Tennessee court of appeals in interpreting a constitutional provision authorizing bail by sureties stated:

It would strain any method of statutory construction to hold that this language gives the judge discretion to require a particular form of bail. If the judge were held to have discretion to require a cash-only bond, he would also arguably have the power, for instance, to demand that a defendant put up qualifying real estate in order to secure his release. If a particular defendant had no qualifying real estate, such a requirement would effectively detain the accused in violation of article I, section 15 of the Tennessee Constitution . . . which provide that "all defendants shall be bailable by sufficient sureties." The same result could arise if a cash-only deposit was required of a defendant who had real estate or other sufficient surety, but no cash.

*Lewis Bail Bond Co. v. Gen. Sessions Ct.*, No. C–97–62, 1997 WL 711137, at 5 (Tenn. Ct.App.1997). The Tennessee court correctly recognizes that a cash-only bond will in most instances be more onerous to a person seeking bail than the constitutional guarantee of bail by sufficient sureties. The opinion of the majority tacitly concedes that that will be the situation with respect to this defendant.

9. The provision of the Ohio Constitution interpreted in this case provided

[a]ll persons shall be bailable by sufficient sureties, except a person who is charged with a capital offense where the proof is evident or the presumption great, and ex-

cept for a person who is charged with a felony where the proof is evidence or the presumption great and where the person poses a substantial risk of serious physical harm to any person in the community.

Ohio Const. art. I, § 9 (1851).

Our constitution guarantees an accused the right to bail "by sufficient sureties." This is indeed an unfettered right to bail by that means. Demanding a cash-only bail is a clear denial of that right. The order of the district court related to bail should be reversed.

LAVORATO, C.J., and TERNUS, J., join this dissent.