# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  50577-1-II |
| Respondent, | |
| v. | |
| QURAN DAYMAN ALI INGRAM, | PUBLISHED IN PART OPINION |
| Appellant. | |

SUTTON, J. — Quran Dayman Ali Ingram appeals from his jury trial convictions for residential burglary (domestic violence) and violation of a domestic violence court order.  He argues that the trial court erred when it imposed bail and denied him pretrial release based on personal recognizance and by ruling that the validity of a foreign protection order[1] is not an element of the offense of violation of a domestic violence court under RCW 26.50.110(1)(a).[2]  In the published portion of this opinion, we hold that although the bail issue is moot, we reach the issue because it is a matter of public importance; the trial court was not required to enter findings; the trial court erred by imposing bail without first considering less restrictive alternatives and Ingram's financial resources; and the validity of the foreign protection order is not an element of the offense.

---

[1] A "foreign protection order" is an order or injunction "issued by a court of another state, territory, or possession of the United States, the Commonwealth of Puerto Rico, or the District of Columbia, or any United States military tribunal, or a tribal court, in a civil or criminal action."  RCW 26.52.010(3).

[2] The legislature amended this statute in 2017.  LAWS OF 2017, ch. 230, § 9.  Because the 2017 amendments did not alter the language at issue here, we cite to the current version of the statute.

In the unpublished portion of the opinion, we hold that remand for reevaluation of several legal financial obligations (LFOs) is required and do not reach Ingram's pro se ineffective assistance of counsel claim raised in his statement of additional grounds (SAG)[3] because that claim involves matters outside the appellate record. Accordingly, we affirm Ingram's convictions, but we remand for the trial court to reexamine the LFOs consistent with this opinion.

FACTS

I. CHARGES

On November 30, 2016, Tiffany Ingram obtained a restraining order in Oregon (Oregon order), prohibiting her husband Ingram from entering or remaining in the area within 150 feet of her current or future residence. The Oregon order stated that the addresses of these locations were being withheld for safety reasons. In another section, the Oregon court struck additional language that stated, "Stay away from home on Rossiter, mother[']s on Alder, Sister[']s on Hood pl [sic] and Grandmother[']s on Riverview." Clerk's Papers (CP) at 56. Tiffany[4] provided the Oregon court with a "safe" "[r]esidence/[c]ontact [a]ddress," in Portland. CP at 61.

On December 1, Tiffany, who had been staying with relatives in Oregon, returned to the home on Rossiter Lane that she and Ingram had shared, locked up the home, and turned off the lights. The next day, she drove past the home and saw that there were lights on inside. Tiffany called the police. The police found Ingram inside the home, and Ingram showed them a copy of the Oregon order. The police arrested Ingram.

_____

[3] RAP 10.10.

[4] We refer to Tiffany Ingram by her first name for clarity. We intend no disrespect.

## II. PRETRIAL AND TRIAL PROCEEDINGS

The State charged Ingram with residential burglary (domestic violence) and a gross misdemeanor violation of a domestic violence court order. Ingram pleaded not guilty to the charges.

### A. RISK ASSESSMENT AND BAIL HEARINGS

Ingram was booked into jail on December 2. On December 4, based on the statement of probable cause, a judge certified that there was probable cause to arrest Ingram. A court date was set for December 5.

In a December 4 risk assessment, the Clark County Corrections Release Unit assigned Ingram a "risk score" of four, which fell between a medium risk (three) and a high risk (five). The release unit's assessment noted that Ingram reported that (1) he had lived by himself in Vancouver, Washington, for the past two and a half years, (2) he had previously lived in Portland, Oregon, (3) he had no family in Clark County, (4) he had not provided any references, and (5) he was unemployed. The assessment further stated that Ingram (1) had a history of escape, (2) was currently on probation on an Oregon driving-related charge, (3) had a criminal history, (4) had prior failures to appear but no bail jump convictions, and (5) had mental health issues including anxiety and posttraumatic stress disorder and had received prior psychiatric treatment. Based on these facts and its risk assessment, the release unit recommended that Ingram be denied release "due to extensive criminal, [failure to appear], and escape record." CP at 3. On December 4, a

judge[5] also issued an order of conditions for release on bail stating that Ingram was not subject to bail until a court hearing set for December 5.

At Ingram's first appearance on December 5, the State requested $60,000 bail. The State justified this request based on Ingram's prior convictions for unlawful possession of a firearm in 2007, second degree assault in 1997, second degree burglary in 1997, first degree escape in 1995, first degree robbery in 1994, and second degree robbery in 2001. The State also commented that Ingram had "six different cases [in Oregon] that have gone to warrant" and that he had "prior [failures to appear] on his cases." 1 Report of Proceedings (RP) at 5. Defense counsel, who had just been appointed to Ingram's case and had just received the statement of probable cause, requested $5,000 bail after noting that the no contact order violation did not involve violence.

The trial court[6] set bail at $60,000 after commenting that when Tiffany applied for the restraining order, she had asserted that Ingram "had recently held a gun to her head." 1 RP at 6. The trial court also stated that it would reexamine bail at the next hearing. It does not appear that the trial court entered any written findings related to the bail decision following the December 5, 2016 hearing. At no point during the hearing did the trial court discuss any less restrictive alternatives to bail or Ingram's financial resources.

---

[5] The Honorable James Rulli signed this order.

[6] The Honorable Daniel Stahnke presided over this hearing.

On December 16,[7] Ingram was arraigned. He pleaded not guilty. Although the trial court[8] had stated at the December 5 hearing that it would reexamine bail at the next hearing, no one raised any bail issues.

On December 21, before a different judge,[9] Ingram requested that the court grant him supervised release. After arguing that there was insufficient evidence to support the charges because the Oregon order was invalid, Ingram requested that the trial court amend the bail order and grant him supervised release because he did not "have the funds to bail out" and he had a legitimate challenge to the charges. 1 RP at 12. After hearing Ingram's criminal history and argument from the parties, the judge deferred this decision to the original trial court judge, effectively denying Ingram's request for supervised release.

On December 28, before the first judge,[10] Ingram asked for a bail reduction based on his legal argument that the Oregon protection order was invalid. The trial court denied this request. The trial court commented that it had originally set bail based on "criminal history, failures to appear, and [the] likelihood of reappearance in court," and that nothing had changed in relation to those factors. 1 RP at 22. During this hearing, there was no discussion of Ingram's financial status or any less restrictive conditions of release other than release on recognizance.

---

[7] Based on the information in the appellate record, this was the first hearing following the December 5 hearing.

[8] Judge Stahnke presided over this hearing.

[9] The Honorable Scott Collier presided over this hearing.

[10] Judge Stahnke presided over this hearing.

## B. VALIDITY OF OREGON ORDER

At various stages of the pretrial proceedings, the parties addressed whether the validity of the Oregon order could be raised before the jury. The trial court[11] ruled that Ingram could not "challenge the validity of the order in Oregon in a Washington criminal case" and that validity of the Oregon order was not an element of the offense. 1 RP at 103.

## C. TRIAL

The State presented testimony from Tiffany and the officers who arrested Ingram. Ingram did not call any witnesses. The jury instructions for the violation of the court order did not require the jury to find that the Oregon order was valid.

The jury found Ingram guilty of residential burglary and violation of a domestic violence court order. Ingram appeals.

## ANALYSIS

### I. BAIL ISSUES

Ingram contends that the trial court erred when it set his bail and refused to release him on his own recognizance and when it denied his renewed motions to reduce his bail requirement. Specifically, Ingram argues that the trial court (1) failed to enter oral or written findings, (2) failed to consider the factors required in CrR 3.2(c) and (e) and the record does not support findings under either subsection, (3) failed to consider less restrictive conditions of release or Ingram's

---

[11] Judge Stahnke entered this order and presided over the trial.

financial resources before imposing the bail requirement, and (4) denied him effective assistance of counsel by not allowing appointed defense counsel time to prepare for the initial bail hearing.[12]

A. MATTER OF CONTINUING AND SUBSTANTIAL PUBLIC INTEREST

We must first address whether this issue is moot. An issue is moot if we can no longer provide effective relief. *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995). We can no longer provide effective relief here because Ingram has been convicted and pretrial bail is no longer available to him.

We may, however, consider a moot issue if it involves matters of continuing and substantial public interest. *State v. Cruz*, 189 Wn.2d 588, 598, 404 P.3d 70 (2017). In determining whether a case presents an issue of continuing and substantial public interest, we consider (1) the public or private nature of the issue, (2) whether guidance for public officers on the issue is desirable, and (3) the likelihood that the issue will recur. *Cruz*, 189 Wn.2d at 598. We also consider "'the likelihood that the issue will escape review because the facts of the controversy are short-lived.'" *State v. Huckins*, 5 Wn. App. 2d 457, 463, 426 P.3d 797 (2018) (internal quotation marks omitted) (quoting *Westerman v. Cary*, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994)).

As we have recognized before, the setting of bail is an issue of a public nature and "there is currently a dearth of cases" addressing bail issues. *Huckins*, 5 Wn. App. 2d at 463-64; *see also State v. Barton*, 181 Wn.2d 148, 152, 331 P.3d 50 (2014) (accepting review of moot bail case

---

[12] Ingram also presents several constitutional arguments related to his bail. Because we exercise our discretion and conclude that the trial court erred on nonconstitutional grounds, we do not address Ingram's constitutional arguments. *State v. Smith*, 104 Wn.2d 497, 505, 707 P.2d 1306 (1985) ("A court will not reach a constitutional issue if it can decide the case on nonconstitutional grounds.").

because it was a matter of continuing and substantial public interest). Deciding this case would provide a useful reminder to the trial courts of the requirements of setting bail and release conditions for criminal defendants—issues that are likely to recur. Furthermore, "given the time constraints inherent in criminal cases, the issue might otherwise evade appellate review." *Huckins*, 5 Wn. App. 2d at 464. Accordingly, we review Ingram's bail arguments on the merits because they present matters of continuing and substantial public interest.

B. FINDINGS

Ingram argues that the trial court was required to make "specific findings under CrR 3.2(a)(1) or (2)" and that the court failed to comply with this requirement. Appellant's Opening Br. at 29. He suggests that the absence of specific findings demonstrates that the trial court ignored the presumption of release on personal recognizance pending trial. Ingram fails to establish that oral or written findings are required, but we review the record to determine if the trial court considered the relevant factors before determining whether release on personal recognizance was appropriate or whether bail was required.

Whether oral or written findings are required is a question of law, which this court reviews de novo. *State v. Hanson*, 151 Wn.2d 783, 784-85, 91 P.3d 888 (2004). We apply canons of statutory interpretation when construing court rules. *State v. Robinson*, 153 Wn.2d 689, 692, 107 P.3d 90 (2005). The plain language of a court rule controls when it is unambiguous. *Robinson*, 153 Wn.2d at 693.

CrR 3.2(a)[13] provides:

Any person, other than a person charged with a capital offense, shall at the preliminary appearance . . . be ordered released on the accused's personal recognizance pending trial unless:

(1) the court *determines* that such recognizance will not reasonably assure the accused's appearance, when required, or

(2) there is shown a likely danger that the accused:

(a) will commit a violent crime, or

(b) will seek to intimidate witnesses, or otherwise unlawfully interfere with the administration of justice.

. . . .

In making the determination herein, the court shall, on the available information, *consider* the relevant facts including, but not limited to, those in subsections (c) and (e) of [CrR 3.2].

(Emphasis added.) CrR 3.2(c) and (e) similarly require only that the trial court "consider" various factors and do not expressly require any oral or written findings.

Although oral or written findings are helpful on appeal, unlike other rules that clearly require oral or written findings,[14] CrR 3.2 does not expressly require that the trial court enter any oral or written findings. CrR 3.2(a) requires only that the trial court (1) "determine[]" whether release on personal recognizance is insufficient to reasonably assure the defendant's appearance

---

[13] CrR 3.2 was amended in 2017. The amendment did not affect subsections (a), (c), or (e), so we cite to the current version of the rule.

[14] *See*, e.g., CrR 3.6(b) (expressly requiring trial court to enter written findings of fact and conclusions of law if evidentiary hearing is conducted); JuCR 7.11(c), (d) (expressly requiring juvenile court to state its findings of fact and enter its decision on the record, and to enter written findings and conclusions in a case that is appealed); CR 54(2)(b) (expressly requiring written findings on CR 54 order).

or protect against harm and (2) "consider" the relevant facts. And CrR 3.2(c) and (e) require the court only to "consider" the factors. Thus, CrR 3.2 itself does not require oral or written findings.[15]

Nor does Ingram cite to any other authority that requires oral or written findings in this context. Although he cites *State v. Rose*, 146 Wn. App. 439, 191 P.3d 83 (2008), for his assertion that the trial court must "rebut the presumption of release by making the specific findings under CrR 3.2(a)(1) or (2), prior to imposing any conditions of release," *Rose* did not address whether findings were required and does not require oral or written findings. Appellant's Opening Br. at 29. In *Rose*, we merely examined the record to determine whether there was a "*determination related to* [the defendant's] unlikeliness to appear" and whether there was any evidence introduced "that would have supported a trial court finding that [the defendant] would be unlikely to appear." 146 Wn. App. at 450 (emphasis added).

Because oral or written findings are not required by the rule, Ingram cites no authority requiring the entry of oral or written findings under CrR 3.2(a), and the trial court made oral findings at a subsequent hearing, Ingram's argument fails.

---

[15] Ingram suggests that the trial court's comments at the initial bail hearing regarding Tiffany's allegations that Ingram had recently held a gun to her head demonstrates that the trial court imposed bail based solely on safety concerns. But this argument overlooks the trial court's statement on the record during the December 28 hearing.

Also referring to the trial court's reference to Tiffany's allegations, Ingram argues that it was improper and unconstitutional for the court "to rely on the nature of a charge or unproven allegations as the primary or sole basis for determining issues of pretrial release." Appellant's Opening Br. at 32-33. The trial court's remarks at the December 28 hearing clarified that it was not solely relying on Tiffany's assertions when it imposed bail and that the court in fact considered other factors. Because the record shows that the court was not relying only on this allegation, Ingram's assertion that such sole reliance was error fails.

C.  CONSIDERATION OF FACTORS AND SUPPORT FOR FINDINGS

Ingram further argues that the record does not show that the trial court considered the required factors stated in CrR 3.2(c) and (e).  In analyzing this issue, we examine the record to determine if the record supports a determination that Ingram would be unlikely to appear or that Ingram was a substantial danger.  *Rose*, 146 Wn. App. at 446-47, 448-54.  Here, the record supports both determinations.

We review a trial court's determination of whether a defendant is likely to flee and whether a defendant is likely to pose a substantial danger to the community for abuse of discretion.  *State v. Smith*, 84 Wn.2d 498, 505, 527 P.2d 674 (1974).  A trial court abuses its discretion if its decision falls outside the range of acceptable choices, its decision is unsupported by the record, or the court applies an incorrect legal standard.  *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

CrR 3.2(c) provides:

In determining which conditions of release will reasonably assure the accused's appearance, the court shall, on the available information, consider the relevant facts including but not limited to:

(1)  The accused's history of response to legal process, particularly court orders to personally appear;

(2)  The accused's employment status and history, enrollment in an educational institution or training program, participation in a counseling or treatment program, performance of volunteer work in the community, participation in school or cultural activities or receipt of financial assistance from the government;

(3)  The accused's family ties and relationships;

(4)  The accused's reputation, character and mental condition;

(5)  The length of the accused's residence in the community;

(6)  The accused's criminal record;

(7)  The willingness of responsible members of the community to vouch for the accused's reliability and assist the accused in complying with conditions of release;

(8)  The nature of the charge, if relevant to the risk of nonappearance;

(9)  Any other factors indicating the accused's ties to the community.

Here, the information available to the trial court included the information in the release unit's report, which addressed factors 1 through 7.  And the trial court was aware of Ingram's current charges and was able to review the factual basis for those charges, including the fact that Tiffany had informed law enforcement officers that she had applied for the no contact order after Ingram held a gun to her head.  Additionally, the State described Ingram's criminal history, including his escape conviction and prior failures to appear in several Oregon cases.  The information before the trial court also showed that the release unit considered Ingram to be a medium to high flight risk; Ingram had a history of escape and failure to appear; he had no employment tying him to the community; no one had vouched for him; Ingram had ties to another state, including formerly residing in Oregon; and he had mental health issues.  These factors support the determination that personal recognizance would not reasonably assure Ingram's appearance when required.

The evidence in the record also supports a finding of dangerousness.

CrR 3.2(e) provides:

In determining which conditions of release will reasonably assure the accused's noninterference with the administration of justice, and reduce danger to others or the community, the court shall, on the available information, consider the relevant facts including but not limited to:

(1)  The accused's criminal record;

(2) The willingness of responsible members of the community to vouch for the accused's reliability and assist the accused in complying with conditions of release;

(3) The nature of the charge;

(4) The accused's reputation, character and mental condition;

(5) The accused's past record of threats to victims or witnesses or interference with witnesses or the administration of justice;

(6) Whether or not there is evidence of present threats or intimidation directed to witnesses;

(7) The accused's past record of committing offenses while on pretrial release, probation or parole; and

(8) The accused's past record of use of or threatened use of deadly weapons or firearms, especially to victims or witnesses.

The available information showed that Ingram had prior convictions for firearm possession and assault; no one had offered to vouch for him; the current charge, although not a violent offense in itself, stemmed from a protection order that was obtained following a violent act against the protected party; Ingram had a history of mental health issues; Ingram had in the past threatened Tiffany with a deadly weapon; and Ingram was on probation when he committed the current offense. These factors, particularly the recent violent act against Tiffany, support the determination that there was a substantial danger that if released, Ingram would either commit a violent crime or seek to intimidate a witness or interfere with the administration of justice.

D.  FAILURE TO CONSIDER LESS RESTRICTIVE CONDITIONS OF RELEASE

Ingram next argues that the trial court failed to comply with CrR 3.2(d) by failing to consider less restrictive conditions of release and when setting the bail amount. Because the trial court did not consider less restrictive conditions of release or Ingram's financial resources before imposing the $60,000 bond as required under both CrR 3.2(b) and CrR 3.2(d), this argument has merit.

CrR 3.2(b) requires that if the trial court determines that the accused is not likely to appear if released on personal recognizance, it must impose the least restrictive of several enumerated conditions. *Huckins*, 5 Wn. App. 2d at 467-68. CrR 3.2(b) also requires that if the trial court imposes a bond, the court must consider the defendant's financial resources. CrR 3.2(b)(7). Similarly, CrR 3.2(d) requires that if the trial court determines that the accused poses a substantial danger, the court is allowed to impose one or more of several enumerated conditions. If the trial court requires the defendant to "post a secured or unsecured bond," the court can impose this condition only "if no less restrictive condition or combination of conditions would reasonable assure the safety of the community." CrR 3.2(d)(6). Additionally, if the trial court requires a bond, the court must consider, "on the available information, the accused's financial resources for the purposes of setting a bond that will reasonably assure the safety of the community and prevent the defendant from intimidating witnesses or otherwise unlawfully interfering with the administration of justice." CrR 3.2(d)(6)

Regardless of whether the trial court imposed bail to ensure Ingram's appearance or to protect the public, the court was required to consider less restrictive alternatives and to consider Ingram's financial resources. CrR 3.2(b)(7), (d)(6). There is nothing in the record suggesting that the trial court did either before setting bail. Thus, Ingram can show that the trial court erred by imposing the $60,000 bond. But because Ingram has been convicted and is no longer subject to pretrial bail or conditions, there is no relief that we can offer.

E. DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL

Ingram also argues that the bail hearing "might have gone a different way" if he had not been forced to rely on newly assigned counsel who had no knowledge of the case or Ingram's

personal circumstances. Appellant's Opening Br. at 46. He suggests that with time to prepare, defense counsel would have been better prepared in relation to the facts and the law. Because Ingram cites no law in support of this argument beyond general law stating that effective assistance of counsel requires more than just having counsel physically present, we decline to address this issue. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (court need not address arguments unsupported by citation to authority).

## II. VALIDITY OF THE FOREIGN PROTECTION ORDER IS NOT AN ESSENTIAL ELEMENT

Ingram next argues that the trial court erred when it concluded that the validity of the Oregon order was not an essential element of the offense of a violation of a domestic violence no contact order under RCW 26.50.110. Whether the validity of a foreign protection order is an element of the crime of violation of a domestic violence court order is an issue of first impression.

Ingram contends that the plain language of RCW 26.50.110(1)(a) establishes that the validity of the Oregon order is an essential element. The State responds that under *State v. Miller*, 156 Wn.2d 23, 123 P.3d 827 (2005), the validity of the Oregon order is not an essential element but, rather, a legal question related to the admissibility of the order for the trial court to decide. We hold that the validity of the Oregon order is not an essential element of the crime of violation of a domestic violence court order.

## A. LEGAL PRINCIPLES

We review questions of law and issues of statutory interpretation de novo. *State v. Conover*, 183 Wn.2d 706, 711, 355 P.3d 1093 (2015); *Miller*, 156 Wn.2d at 27.

The essential elements of the crime are those that the State must prove to sustain a conviction. *State v. Peterson*, 168 Wn.2d 763, 772, 230 P.3d 588 (2010). To determine the

15

essential elements, we first look to the statute. *State v. Williams*, 162 Wn.2d 177, 183, 170 P.3d 30 (2007); *State v. Mason*, 170 Wn. App. 375, 379, 285 P.3d 154 (2012).

Our primary objective when interpreting a statute "is to determine and give effect to the legislature's intent." *State v. Budik*, 173 Wn.2d 727, 733, 272 P.3d 816 (2012). We first look to the plain meaning of the statute. *Budik*, 173 Wn.2d at 733. "'In determining the plain meaning of a provision, we look to the text of the statutory provision in question, as well as the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Budik*, 173 Wn.2d at 733 (internal quotation marks omitted) (quoting *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010)). "Common sense informs our analysis," and we must avoid constructions that would yield an unlikely, absurd, or strained result. *State v. Alvarado*, 164 Wn.2d 556, 562, 192 P.3d 345 (2008); *State v. Barbee*, 187 Wn.2d 375, 389, 386 P.3d 729 (2017).

B. VALIDITY OF FOREIGN ORDER IS NOT AN ELEMENT

RCW 26.50.110(1)(a) provides in part:

Whenever . . . *there is a valid foreign protection order as defined in RCW 26.52.020*, and the respondent or person to be restrained knows of the order, a violation of any of the following provisions of the order is a gross misdemeanor, except as provided in subsections (4) and (5) of this section[16]:

    (i) The restraint provisions prohibiting acts or threats of violence against, or stalking of, a protected party, or restraint provisions prohibiting contact with a protected party;

    (ii) A provision excluding the person from a residence, workplace, school, or day care;

    (iii) A provision prohibiting a person from knowingly coming within, or knowingly remaining within, a specified distance of a location;

    . . . or

---

[16] Subsections (4) and (5) set out the circumstances that elevate the offense from a gross misdemeanor to a felony. *See* RCW 26.50.110(4), (5).

(v) A provision of a foreign protection order specifically indicating that a violation will be a crime.

(Emphasis added.)

RCW 26.52.020 provides:

A foreign protection order is valid if the issuing court had jurisdiction over the parties and matter under the law of the state, territory, possession, tribe, or United States military tribunal. There is a presumption in favor of validity where an order appears authentic on its face.

A person under restraint must be given reasonable notice and the opportunity to be heard before the order of the foreign state, territory, possession, tribe, or United States military tribunal was issued, provided, in the case of ex parte orders, notice and opportunity to be heard was given as soon as possible after the order was issued, consistent with due process.

Ingram argues that RCW 26.50.110(1)(a)'s plain language, which requires a *valid* foreign protection order as defined in RCW 26.52.020, establishes that the validity of the foreign protection order is an element of the crime that must be found by the jury. But Ingram reads this language in isolation.

When RCW 26.50.110(1)(a) is read with RCW 26.52.020, it becomes apparent that the question of whether a foreign order is valid requires an examination of legal issues, such as jurisdiction. *See Pruczinski v. Ashby*, 185 Wn.2d 492, 374 P.3d 102 (2016). As acknowledged in *Miller*, the validity of a court order "normally turn[s] on questions of law," and "[q]uestions of law are for the court, not the jury, to resolve." 156 Wn.2d at 31.

Ingram argues that *Miller* does not apply because it addresses domestic (Washington) protection orders and, unlike the clause addressing foreign protection orders, the plain language of RCW 26.50.110 does not require proof that domestic protection orders are valid. Although *Miller* is not directly on point, it is still instructive.

*Miller* not only acknowledged that the validity of an order involved legal issues, it also stated that the question of a protection order's validity was a threshold matter related to the admissibility of the order. 156 Wn.2d at 31. The *Miller* court stated,

> The court, as part of its gate-keeping function, should determine as a threshold matter whether the order alleged to be violated is applicable and will support the crime charged. Orders that are not applicable to the crime should not be admitted. If no order is admissible, the charge should be dismissed.

156 Wn.2d at 31 (footnote omitted). Although *Miller* addressed Washington State (domestic) protection orders, the relationship between a protection order's validity and its admissibility does not depend on whether the protection order is domestic or foreign. Thus, before the trial court can admit the foreign protection order, it must first determine its validity, and it would be redundant to also require a jury to also make this finding. Additionally, it would lead to an absurd result if the question of the validity of a protection order is a question of law under some circumstances but not others.

The potential redundancy combined with the fact that determining the validity of an order is generally a legal question and our need to avoid an absurd result lead us to conclude that the validity of the foreign protection order is not an essential element that the jury must decide. Because the validity of the Oregon order was not an element of the offense, the trial court did not err when it ruled on the validity of the order.[17]

---

[17] In his assignments of error, Ingram also asserts that the charging information and jury instructions were inadequate because they did not include the validity of the Oregon order as an element. Because we hold that the validity of the Oregon order was not an element, these arguments also fail.

Additionally, in his argument, Ingram questions the validity of the Oregon order. Although this discussion could imply that Ingram is challenging the trial court's ruling that the Oregon order

No. 50577-1-II

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

ADDITIONAL FACTS

During Ingram's sentencing hearing, there was no discussion of Ingram's employment history, financial status, education, indigence, or present or future ability to pay any LFOs. Nor did the trial court make any oral rulings related to LFOs.

Despite the lack of an oral ruling related to LFOs, Ingram's felony judgment and sentence contains a finding stating that Ingram was "presently indigent but is anticipated to be able to pay financial obligations in the future." CP at 366. In contrast, his misdemeanor judgment and sentence states that the trial court found that Ingram "does not have the ability to pay legal financial obligations as imposed below." CP at 381.

The felony judgment and sentence references the following LFOs:

$500 Victim assessment (RCW 7.68.035)
$100 Domestic violence assessment (RCW 10.99.080)
$15  Violation of a domestic violence protection order (RCW 26.50.110)
$200 Criminal filing fee (RCW 10.46.190)
$250 Jury demand fee[18]

---

was valid, he does not raise this claim in his assignments of error or issue statements and he ties this discussion to his assertion that validity of the Oregon order was an element of the offense. Accordingly, we limit our analysis to whether the validity of the Oregon order was an element of the offense. *See Eichler v. Yakima Valley Transp. Co.*, 83 Wn.2d 1, 6, 514 P.2d 1387 (1973) ("Arguments that are not supported by specific assignments of error will not be considered.") (citing *Rutter v. Rutter*, 59 Wn.2d 781, 370 P.2d 862 (1962)).

[18] Ingram does not challenge the jury demand fee, and it is unclear whether the trial court actually imposed the jury demand fee.

$100    DNA[19] collection fee (RCW 43.43.7541)

CP at 369.  The felony judgment and sentence also stated that interest on the nonrestitution LFOs would start to accrue on the date of judgment.  In the misdemeanor judgment and sentence, the trial court imposed a $200 criminal filing fee and stated that interest would begin to accrue from the date of the judgment.

Ingram's felony judgment and sentence also disclosed that he had several prior felony convictions.  The felony judgment and sentence further showed that Ingram had a conviction for first degree escape in 1994 and 22 Oregon probation violations between November 2012 and December 2013.

ADDITIONAL ANALYSIS

III.  LFO ISSUES

In supplemental briefing, Ingram argues that under *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018) and Engrossed Second Substitute House Bill 1783, 65th Leg., Reg. Sess. (Wash. 2018), which amended various LFO statutes, we should strike (1) the $200 criminal filing fees imposed in both the felony and misdemeanor judgments and sentences, (2) the interest provisions in both judgments and sentences, (3) the $100 DNA collection fee in the felony judgment and sentence, (4) the $100 domestic violence assessment in the felony judgment and sentence, and (5) the domestic violence no contact order fee of $15 in the felony judgment and sentence.  The State concedes that the amended versions of the LFO statutes apply.

---

[19] Deoxyribonucleic acid.

We affirm the $15 domestic violence no contact order fee. But we remand for the trial court to strike the nonrestitution interest provisions and to reconsider the criminal filing fee, the DNA collection fee, and the domestic violence assessment. And if the trial court did intend to impose the jury demand fee, it must comply with *Ramirez,* as discussed below.

A. 2018 AMENDMENTS AND *RAMIREZ*

In 2018, our legislature amended numerous LFO statutes. *See* Laws of 2018, ch. 269. These amendments prohibited (1) the imposition of discretionary "costs as described in RCW 10.01.160," on indigent defendants, (2) the imposition of various non-discretionary LFOs on indigent defendants, (3) the imposition of the DNA testing fee if "the state has previously collected the offender's DNA as a result of a prior conviction," and (4) interest on nonrestitution LFOs. Laws of 2018, ch. 269, §§ 1-6, 14, 16-18. In *Ramirez*, our Supreme Court held that the 2018 amendments apply to all cases, such as Ingram's case, that were not final at the time of the amendments. 191 Wn.2d at 747.

B. CRIMINAL FILING FEE, INTEREST ON NONRESTITUTION LFOs, DNA FEE AND JURY DEMAND FEE

The trial court imposed the $200 criminal filing fee in both the felony and misdemeanor judgments and sentences. RCW 36.18.020(2)(h) now prohibits the trial court from imposing the $200 criminal filing fee on "a defendant who is indigent as defined in RCW 10.101.010(3) (a) through(c)." The record does not show whether the trial court determined that Ingram was indigent

under RCW 10.101.010(3) (a) through (c).[20] Accordingly, we remand for a sufficient inquiry into Ingram's ability to pay before the trial court can reimpose the criminal filing fees.

The trial court also imposed interest on the LFOs from the date of judgment in both the felony and misdemeanor judgments and sentences. RCW 10.82.090 provides that the trial court cannot impose interest on any nonrestitution legal financial obligations. Thus, we remand for the trial court to strike those interest provisions from the felony and misdemeanor judgments and sentences.

The trial court also imposed the DNA collection fee in the felony judgment and sentence. RCW 43.43.7541 prohibits the trial court from imposing the DNA collection fee if "the state has previously collected the offender's DNA as a result of a prior conviction." Ingram's felony judgment and sentence shows that he had several prior felony convictions, but the trial court made no inquiry into whether Ingram's DNA had been previously collected. Thus, we remand for the trial court to determine if this fee should have been imposed.

Although the judgment and sentence is ambiguous as to imposition of the jury demand fee, we note that this fee is a discretionary cost, *State v. Lundy*, 176 Wn. App. 96, 107, 308 P.3d 755 (2013). On remand, the trial court must determine whether it imposed this fee. If the trial court did impose this fee, it must reconsider imposing this fee in light of *Ramirez* and the 2018 legislative amendments.

C. DOMESTIC VIOLENCE ASSESSMENT

---

[20] We note that although the trial court found Ingram indigent for purposes of this appeal, the order of indigency does not disclose the basis for the indigency finding.

Ingram also argues that RCW 10.01.160(3) prohibits the trial court from imposing the discretionary domestic violence assessment allowed under RCW 10.99.080. The State argues that the domestic violence assessment is not subject to the 2018 amendments because it is not a "cost" under RCW 10.01.160, and the 2018 amendments did not change RCW 10.99.080.

Regardless of whether the 2018 amendments apply to the domestic violence assessment, RCW 10.99.080(5) requires the trial court to consider ability to pay before imposing this assessment and the record shows that it failed to do so. Accordingly, we remand for the trial court to reconsider imposing this assessment after considering Ingram's ability to pay.

D. DOMESTIC VIOLENCE NO CONTACT ORDER FEE

Ingram also challenges the imposition of the $15 domestic violence no contact order fee.[21] The trial court did not err when it imposed this fee.

RCW 26.50.110(1)(b)(ii),[22] provides that the trial court "[s]*hall* impose a fine of fifteen dollars, in addition to any penalty or fine imposed, for a violation of a domestic violence protection order issued under this chapter." (Emphasis added.) The statute does not require the trial court to consider ability to pay before imposing this fee. And the 2018 amendments did not address RCW 26.50.110. Because the domestic violence no contact order fee is mandatory rather than discretionary, and RCW 26.50.110(1)(b)(ii) does not require the trial court to consider ability to

---

[21] Ingram argues that "there is no authority in the statute for the additional $15 fee," he is mistaken. Suppl. Br. of Appellant at 7. RCW 26.50.110(1)(b)(ii) provides for the imposition of the $15 domestic violence no contact order fee.

[22] The legislature amended RCW 26.50.110 in 2017 and 2019. Laws of 2017, ch. 230, § 9; Laws of 2019, ch. 46, § 5039. Because these amendments did not change the language relevant to this appeal, we cite to the current version of the statute.

pay, and it was not changed by the 2018 amendments, the trial court did not err in imposing this fee.

## IV. SAG CLAIM

In his SAG, Ingram contends that he received ineffective assistance of counsel when defense counsel failed to request that a potential juror who with whom counsel had had "a conflict of interest" be excused. SAG at 1. Because the jury voir dire is not part of the record on appeal, this matter is outside the record, and thus, we do not address this claim. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

## CONCLUSION

We affirm the convictions and hold that the trial court erred when it imposed bail without considering less restrictive conditions of release and Ingram's financial status. We remand for the trial court to reexamine the LFOs consistent with this opinion.

SUTTON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.

24