# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57518-3-II |
| Respondent, | |
| v. | |
| MARK THOMAS HENSLEY, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—Mark Hensley was convicted of felony harassment for threatening to kill a Clark County Superior Court judge. After Hensley appealed his judgment and sentence, the United States Supreme Court decided *Counterman v. Colorado*,[1] which refined the standard for determining whether a defendant's statement is a true threat lacking First Amendment protection.

Hensley argues that there was insufficient evidence to sustain his conviction, that his conviction violated the First Amendment to the United States Constitution, and that the trial court violated CrR 3.2 by failing to consider the factors required to overcome the presumption of release on personal recognizance and imposing excessive bail.

We conclude that Hensley's challenge to the sufficiency of the evidence fails. Nevertheless, we hold that Hensley's conviction violated the First Amendment because the jury instructions allowed the jury to convict him without finding that he had the subjective intent

---

[1] __ U.S. __, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

*Counterman* requires. Due to conflicting testimony at trial about Hensley's mental state, this error was not harmless beyond a reasonable doubt. We therefore reverse Hensley's conviction and remand for a new trial. We decline to review Hensley's CrR 3.2 claims because we cannot provide effective relief, and Hensley's arguments do not raise issues of continuing and substantial public interest that warrant review despite mootness.

FACTS

At a Costco store in Clark County, Washington, Mark Hensley told a store manager, "[R]ight now, there is a legitimate death threat that I have made to assassinate [a specific judge] in Clark County of the Washington State Superior Court. I don't want to do that. But I'm willing to do that." Verbatim Rep. of Proc. (VRP) at 203. Hensley recorded the conversation and later emailed the recording to the store manager, who turned it over to law enforcement. "[T]wo or three" sources advised the judge of the threat. VRP at 208.

Law enforcement called Hensley the next day. A sergeant asked Hensley if he had made threats to the judge. Hensley responded that the sergeant was "up to speed." VRP at 217. Hensley said he would kill someone in one day if he was not taken seriously.

Hensley later apologized to the judge by posting a video on YouTube. In the video, Hensley said, "It seems that I was wandering around the Camas Costco and telling everybody that I was going to shoot [the judge]." VRP at 221.

The State charged Hensley with felony harassment.[2] Hensley was released from custody March 5, 2021, on supervised release.

___

[2] The State also charged Hensley with gross misdemeanor harassment in connection with a separate incident. The State later dropped that charge.

A day later, Hensley allegedly entered a Fred Meyer store, threatened to stab someone, threw a knife at an employee, and stole four cans of whipped cream. Hensley allegedly said that if he were to return to the store, he would bring a firearm and use it against store employees and customers.

Law enforcement arrested Hensley based on the incident. Hensley was again released from custody on supervised release, but law enforcement arrested him four days later after he allegedly threatened to kill his roommate. Hensley was then declared incapable of assisting in his own defense. Hensley underwent competency restoration.

The judge testified for the State at the trial on the felony harassment charge that was based on the threat to assassinate him. The judge said that once he learned about Hensley's threat, he began paying attention to whether he was being followed while driving home, varied his route instead of driving home the same way, placed Hensley's picture on his refrigerator for more than a year, told his family to call 911 if they saw Hensley, and made sure his judicial assistant was aware of the threat and Hensley's physical description. During cross-examination, defense counsel asked the judge if he recalled "expressing fear" to the State's investigator, and the judge responded, "Yeah, I think I said I was, you know, cautiously concerned or something of that nature." VRP at 213. The judge described several prior interactions where Hensley "seem[ed] to be in a different kind of state of mind" depending on the day, with several instances where Hensley's behavior was "aggressive" and "inappropriate." VRP at 210.

The executive director for the National Alliance of Mental Illness Southwest Washington testified for Hensley. She said she knew Hensley personally and was aware he had Tourette Syndrome. She said she spoke with Hensley on the day he made the threat against the judge, and

"he was not doing well at all." VRP at 242. "His thinking was not on track and . . . his speech was manifesting [in] very rapid and non-sensible ways." *Id.*

Hensley also testified. He confirmed that he had Tourette Syndrome. He said his symptoms included "vocal outbursts," "non-sensical speech," and "impulsivity issues," and he was experiencing those symptoms on the day he made the threat against the judge. VRP at 246. In explaining why he made the threat, Hensley gave a number of reasons. He said it is "universally understood that you can get psychiatric treatment . . . if you're a threat to yourself or a threat to somebody else," and he "was trying to figure out how to get [himself] arrested" so that he could get treatment. VRP at 250. He added, "[A] threat is benign, especially one that is just so over the top or absolutely ridiculous." *Id.* He explained that he chose to threaten the judge instead of "a general person" because the judge knew him, knew he "had dealt with mental health issues," and knew he was nonviolent and not a threat. *Id.*

During closing arguments, defense counsel highlighted the fact that Hensley had Tourette Syndrome, arguing that Hensley had experienced a mental health crisis that caused him to make statements he later regretted. Defense counsel pointed to Hensley's apology video as evidence of the fact that Hensley was not aware of his actions when he made the threat, arguing that Hensley "was delusional and in a manic state." VRP at 279. To that end, defense counsel argued that Hensley made egregious statements because he wanted to go to "jail to stabilize his mental health," not because he actually intended to kill the judge. VRP at 280.

The trial court instructed jurors that, to convict Hensley, they had to find that Hensley "knowingly threatened to kill [the judge] immediately or in the future." Clerk's Papers (CP) at 122. They also had to find that Hensley's words or conduct placed the judge "in reasonable fear

4

that the threat to kill would be carried out." *Id.* The trial court further instructed jurors that, to be a true threat, a statement must occur under "circumstances where a reasonable person, in the position of the speaker, would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk." CP at 124.

The jury found Hensley guilty of felony harassment. The trial court sentenced Hensley to 90 days of confinement with credit for time served.

Hensley appealed his judgment and sentence.

ANALYSIS

I. THE JUDGE'S REASONABLE FEAR

Hensley argues that the State failed to present sufficient evidence of the threatened judge's reasonable fear to sustain his conviction. We address this issue first because if Hensley is correct, the remedy is dismissal with prejudice, precluding a new trial. Specifically, Hensley asserts there is insufficient evidence demonstrating that the judge "actually and reasonably feared that the alleged threat to kill would be carried out." Br. of Appellant at 21. The State responds that it was reasonable to infer fear from the judge's actions after learning about this threat. We agree with the State that sufficient evidence of the judge's reasonable fear supported Hensley's conviction.

There is sufficient evidence to support a conviction if any rational trier of fact could find the elements of the charged crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the State. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). When contesting the sufficiency of the evidence, the defendant admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *State v. Trey M.*, 186 Wn.2d 884,

905, 383 P.3d 474 (2016). Circumstantial evidence and direct evidence are equally reliable. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). "Our role is not to reweigh the evidence and substitute our judgment for that of the jury." *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). Rather, because the jury "observed the witnesses testify firsthand, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness and the appropriate weight to be given the evidence." *Id.* "A reviewing court will reverse a conviction for insufficient evidence only if no rational trier of fact could find that the State met its burden." *State v. Teal*, 152 Wn.2d 333, 337, 96 P.3d 974 (2004).

A.      Elements of Harassment

A person is guilty of harassment under RCW 9A.46.020 if, without "lawful authority," they knowingly threaten to "cause bodily injury immediately or in the future to the person threatened or to any other person," and they place "the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(a)(ii), (b).[3] Harassment becomes a class C felony if it involves "threatening to kill the person threatened or any other person." RCW 9A.46.020(2)(b)(ii). "'Threat' means to communicate, directly or indirectly[,] the intent" to "cause bodily injury in the future to the person threatened or to any other person." RCW 9A.04.110(28)(a). A victim must subjectively fear that the threat made against them will be carried out. *Trey M.*, 186 Wn.2d at 905; *State v. E.J.Y.*, 113 Wn. App. 940, 953, 55 P.3d 673 (2002).

Hensley argues that the judge testified only that he was "cautiously concerned," not that he was afraid. VRP at 213. Hensley then relies heavily on *State v. C.G.*, 150 Wn.2d 604, 80 P.3d 594

---

[3] We cite to the current version of the statute because the relevant language has not changed.

(2003), to argue that the judge's actions after learning of Hensley's threat were insufficient for the jury to infer that he was afraid. This reliance is misplaced, in part because *C.G.* examined and resolved a different question than what is before us.

In *C.G.*, the Washington Supreme Court reversed the defendant's felony harassment conviction because there was "no evidence that [the victim] was placed in reasonable fear that [the defendant] would *kill* him." 150 Wn.2d at 610 (emphasis added). The case turned on the fact that the defendant had threatened to *kill* the victim, but the victim testified that he was concerned the defendant might to try to *harm* him or someone else in the future. *Id.* at 607. Thus, because the victim was afraid of bodily harm and not death, the evidence was sufficient to support a misdemeanor conviction but not a felony conviction. *Id.* at 611. Contrary to Hensley's claims, *C.G.* does not stand for the proposition that an expression of concern combined with evidence of precautions taken is insufficient to establish that a victim is afraid the threat will be carried out.

Hensley also relies on *Trey M.*, where the court held that the evidence was sufficient to support the defendant's felony harassment convictions because the victims testified that they were "'scared'" when they heard they were on the defendant's "'hit list.'" 186 Wn.2d at 905. But even though express statements of fear like those made in *Trey M.* are sufficient to demonstrate subjective fear, the court did not hold that an express statement is necessary to demonstrate that a victim was afraid. *Id.*

Finally, the statute requires the victim's fear to be objectively reasonable. *Id.* at 898. A determination as to whether a victim's fear is objectively reasonable is "a question for the trier of fact in light of the total context." *Id.* at 906.

B.      Sufficient Evidence Supports the Judge's Reasonable Fear

Here, there is no dispute that the judge was aware of the threat, and the State presented sufficient evidence to demonstrate that the judge subjectively experienced fear. Contrary to Hensley's claims, a victim's "cautious concern" can support an inference of reasonable fear when combined with evidence that the person took precautions to avoid being harmed. Unlike in *C.G.*, where the victim expressly testified to a fear of bodily harm rather than death, the judge told the investigator that he was "cautiously concerned or something of that nature." VRP at 213. The judge also described the changes he made in his personal life, and these changes—which included alerting his family and court staff to the threat, changing his route home, and putting a picture of Hensley on his refrigerator for more than a year—provided evidence. When viewed in a light most favorable to the State, that was sufficient for a rational trier of fact to conclude that the judge feared Hensley would try to kill him.

Moreover, sufficient evidence supports the finding that the judge's fear was objectively reasonable in light of the total context. Despite Hensley's claim that he made the threat in an attempt to obtain mental health services, Br. of Appellant at 32-33, the record does not show that the judge had any reason to see the threat solely as a means of getting treatment. When law enforcement followed up with Hensley about the threat to kill the judge, Hensley confirmed the officer was "up to speed" rather than retracting the threat or saying he did not mean it. VRP at 217. The jury had the opportunity to weigh the evidence and determine whether, in spite of Hensley's contentions that his threat was not serious, it was reasonable for the judge to be afraid that Hensley would kill him. The jury concluded that the judge's fear was reasonable. Viewing the evidence in the light most favorable to the State, the evidence supports that conclusion.

We conclude that there was sufficient evidence of the judge's reasonable fear that the threat would be carried out to sustain Hensley's felony harassment conviction.

## II. TRUE THREAT

Hensley also argues that the jury "did not have the constitutionally appropriate framework" to determine whether his speech lacked First Amendment protection. Suppl. Br. of Appellant at 8. He contends that because the jury did not have to find he was aware his statements could have been understood as threats, and because *Counterman* requires proof of a "subjective intent to threaten," he is entitled to vacation of his conviction and a new trial. *Id.* at 7. He maintains that this error was not harmless because the evidence at trial makes it unclear "whether the jury would have convicted on proper grounds." *Id.* at 9.

The State concedes that the jury instruction defining a true threat "lacked the subjective definition now required" by *Counterman*. Suppl. Br. of Resp't at 1 (boldface omitted). But the State argues that the error was "harmless beyond a reasonable doubt," contending that the "record shows . . . Hensley intended for his threat to be believed." *Id.* at 3-4. The State explains that Hensley "affirmed his wish to be taken seriously when law enforcement called to ask about the threat" and that at trial, "Hensley expressed various reasons why he wanted people to believe his threat." *Id.* at 4. We accept the State's concession that the jury instruction defining a true threat was erroneous in light of *Counterman*. However, we agree with Hensley that this error was not harmless.

We apply *Counterman* in this case because Henley's appeal is not yet final. *See State v. Harris*, 154 Wn. App. 87, 92, 224 P.3d 830 (2010). A jury instruction is erroneous if it does not properly inform the jury of the applicable law. *See State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

9

A.      Constitutionality of Jury Instructions

The First Amendment does not protect true threats of violence. *Counterman*, 143 S. Ct. at 2113. "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 2114 (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003)).

Whether a statement is a true threat depends on what the statement conveys to the listener rather than on the speaker's mental state. *Id.* But in *Counterman*, the United States Supreme Court held that the First Amendment demands "a subjective mental-state requirement shielding some true threats from" criminal liability because prohibitions "on speech have the potential to chill . . . speech outside their boundaries." *Id.* Therefore, the Court held that where the State prosecutes a defendant for making a threat, it must prove the defendant made the threat recklessly: "The State must show that the defendant consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." *Id.* at 2111-12. In other words, the State must demonstrate that the defendant was "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" *Id.* at 2117 (quoting *Elonis v. United States*, 575 U.S. 723, 746, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) (Alito, J., concurring in part and dissenting in part)). Doing so entails "consciously [accepting] a substantial risk of inflicting serious harm." *Id.* at 2118. Still, under this test, the State need not prove that the defendant actually intended to carry out their threat. *Id.* at 2117.

Under *Counterman*, the jury instruction defining a true threat that was given in this case was erroneous. The trial court instructed the jury that to be a true threat, a statement "must occur in a context or under such circumstances where *a reasonable person*, *in the position of the speaker*,

would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat." CP at 124 (emphasis added). But *Counterman* requires proof "that the *defendant*"—not just a reasonable person in their position—"consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." 143 S. Ct. at 2112. In other words, *Counterman* requires proof that the defendant was actually "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" *Id.* at 2117 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)).

Although the trial court instructed the jury that the State had to prove Hensley "*knowingly* threatened to kill*" the judge, this instruction did not negate the more specific true threat instruction, which expressly conveyed a reasonable person standard rather than a subjective standard now required by *Counterman*. CP at 122 (emphasis added). As explained in *Trey M.*, the element of knowledge goes to whether the defendant knew they were conveying a threat, as opposed to keeping their words private, and whether they knew the communication they were imparting was a threat to harm or kill the person threatened or another person. 186 Wn.2d at 895. Thus, if a person mutters a threat without awareness that it was heard, their conduct does not satisfy the statutory knowledge requirement. *Id.*

The true threat instruction given to the jury, in contrast, allowed the jury to find Hensley guilty without finding that he had the subjective awareness of the "substantial risk that [the] communications would be viewed as threatening violence," as *Counterman* requires. 143 S. Ct. at 2112. We therefore accept the State's concession that the true threat instruction was erroneous.[4]

---

[4] This instruction was based on a Washington pattern jury instruction that has since been revised to incorporate the rule *Counterman* announced. In defining a "threat," the revised instruction states that "the speaker must know of and disregard a substantial risk that the statement or act would be

B.      Constitutional Harmless Error

The "omission of the constitutionally required mens rea from the jury instructions . . . is analogous to" the omission of an element of the crime from the instructions. *State v. Schaler*, 169 Wn.2d 274, 288, 236 P.3d 858 (2010). Such an omission is thus subject to constitutional harmless error review. *Id.* "An error is harmless and not grounds for reversal if the appellate court is assured beyond a reasonable doubt that the jury would have reached the same verdict without the error." *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019). An omission of this nature "may be harmless when it is clear that the omission did not contribute to the verdict," such as when "uncontroverted evidence" supports the omitted element. *Schaler*, 169 Wn.2d at 288. Conversely, an "error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds." *Id.*

Here, on one hand, Hensley testified that he had planned to make the threat because it is "universally understood that you can get psychiatric treatment . . . if you're a threat to yourself or a threat to somebody else." VRP at 250. He explained, "I was trying to figure out how to get myself arrested." *Id.* And the sergeant testified that the day after Hensley made the threat, she asked Hensley if he had made threats to the judge, and Hensley responded that she was "up to speed," adding that he would kill someone within a day if he was not taken seriously. VRP at 217. Given that Hensley said he had the predetermined goal of being seen as a threat, and given that Hensley

---

interpreted" as "a serious expression of intention to carry out the threat." Washington Pattern Jury Instructions:      Criminal      2.24      (updated      Jan.      2024), https://govt.westlaw.com/wcrji/Document/Ief9980dde10d11daade1ae871d9b2cbe?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc. Default) [https://perma.cc/S3KL-R386]

confirmed the threat a day after he made it, the jury could have found that he was aware others could regard his statements as threatening homicide and delivered them anyway.[5]

On the other hand, Hensley testified that he had Tourette Syndrome, that his symptoms included "vocal outbursts and non-sensical speech," and that he was experiencing those symptoms when he said he would kill the judge. VRP at 246. The executive director for the National Alliance of Mental Illness Southwest Washington confirmed that Hensley had Tourette Syndrome and testified that on the day he made the threat, Hensley's "thinking was not on track" and his speech was "non-sensible." VRP at 242. Moreover, the jury saw a video where Hensley apologized to the judge and said, "It seems that I was wandering around the Camas Costco and telling everybody that I was going to shoot [the judge]." VRP at 221. At closing, defense counsel argued that the video showed that Hensley was not aware of his actions when he made the threat. Based on the testimony about Hensley's symptoms and the video Hensley made, the jury could have found that Hensley was too unwell to appreciate what he was saying or the effects of his statements on others when he threatened to kill the judge.

Also, Hensley testified that he made the threat to get himself arrested because "a threat is benign, especially one that is just so over the top or absolutely ridiculous." VRP at 250. He said he threatened to kill the judge specifically because the judge knew he was nonviolent and not a

---

[5] We note that Hensley also challenges the sufficiency of the evidence to support a true threat. Despite our conclusion that the instructional error was not harmless, the evidence recited in this paragraph, if believed by a jury, would be sufficient to support a finding that a true threat occurred. Applying the sufficiency of the evidence standard of review, which assumes the truth of all of the State's evidence, we conclude that there was sufficient evidence to support a finding that Hensley made a true threat. Thus, the State is entitled to a new trial.

threat. From this testimony, the jury could have found that Hensley did not think others could regard his statements as genuinely threatening homicide.

In sum, there was conflicting evidence about whether Hensley acted recklessly. The testimony about Hensley's state of mind on the day he made the threat points to several possibilities. There is evidence that Hensley was aware others could regard his statements as threatening homicide, that Hensley's mental health crisis precluded that awareness, or that Hensley made the threat with the assumption that no one would take it seriously. This conflicting evidence creates ambiguity around whether the jury would have convicted Hensley of felony harassment if it had been required to find that Hensley "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 143 S. Ct. at 2112. The erroneous jury instruction was therefore not harmless beyond a reasonable doubt.

We reverse Hensley's conviction and remand for a new trial.

### III. BAIL

Hensley contends that the trial court also violated CrR 3.2 by failing to consider the factors required to overcome the presumption of release on personal recognizance and by imposing excessive bail. The State responds that the issue is moot because the court can no longer provide effective relief and the matter is not one of continuing and substantial public interest. The State points to *State v. Ingram*[6] and *State v. Huckins*[7] as already providing authoritative guidance on these very issues, thus negating the need for us to reach this issue as a matter of continuing and substantial public interest. In turn, Hensley argues that "[t]he superior court's refusal to apply the

---

[6] 9 Wn. App. 2d 482, 447 P.3d 192 (2019).
[7] 5 Wn. App. 2d 457, 426 P.3d 797 (2018).

presumption of personal recognizance and the other provisions and limits of CrR 3.2, and the constitutional implications of those failures, are issues of continuing and substantial interest, likely to arise again but evade review." Br. of Appellant at 43. We agree with the State.

An issue is moot if the court can no longer provide effective relief. *Ingram,* 9 Wn. App. 2d at 490. Nonetheless, we retain the discretion to reach and decide an otherwise moot issue if it is one of continuing and substantial public interest. *Id.* In *Ingram* and *Huckins*, we addressed otherwise moot issues of pretrial release because there was a lack of cases addressing bail issues. *Id.*; *Huckins*, 5 Wn. App. 2d at 463-64.

In *Ingram*, we provided guidance on a trial court's determination under CrR 3.2 "of whether a defendant is likely to flee and whether a defendant is likely to pose a substantial danger to the community." 9 Wn. App. 2d at 493. Additionally, we held that the trial court should have considered less restrictive conditions of release and the defendant's financial resources before setting bail. *Id.* at 496-97.

In *Huckins*, we reviewed the trial court's determination that the defendant was a "'substantial danger'" and thus ineligible for release on personal recognizance. 5 Wn. App. 2d at 465 (quoting *State v. Smith*, 84 Wn.2d 498, 505, 527 P.2d 674 (1974)). We held that the trial court failed to consider less restrictive conditions of release that would reasonably ensure the safety of the community. *Id.* at 469.

Here, the issues related to pretrial bail and release are moot because we can no longer provide effective relief postconviction. Furthermore, the issues Hensley raises are substantially similar to those already addressed in *Ingram* and *Huckins*. Specifically, Hensley asks us to review the trial court's decision to deny release on personal recognizance because the trial court

determined he was a substantial danger under CrR 3.2(e). He also asks us to review the trial court's imposition of a financial condition of release, arguing that the court failed to consider less restrictive alternatives. Hensley's claims do not present an opportunity for us to issue new guidance on these issues, and thus, given that we cannot provide effective relief, we decline to further review his CrR 3.2 arguments.

## CONCLUSION

We reverse Hensley's judgment and sentence and remand for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Lee, J.

Che, J.